NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-13904

MARTINA JACKSON & another[1]  vs.  ATTORNEY GENERAL & another.[2]


Suffolk.    May 4, 2026. - June 22, 2026.

Present:  Budd, C.J., Gaziano, Kafker, Wendlandt, Georges,
Dewar, & Wolohojian, JJ.


Initiative.  Constitutional Law, Initiative petition, Elections,
    Political party, Primary.  Elections, Ballot, Political
    party, Primary.  Civil Rights, Voting.  Attorney General.



Civil action commenced in the Supreme Judicial Court for
the county of Suffolk on February 20, 2026.

The case was reported by Gaziano, J.


Andrew M. London (Thaddeus Heuer also present) for the
plaintiffs.
Anne Sterman, Assistant Attorney General, for the
defendants.


WENDLANDT, J.  The plaintiffs, two registered voters,

challenge the Attorney General's certification of an initiative

_____

[1] Ann Roosevelt.

[2] Secretary of the Commonwealth.

petition that would replace the system for State elections, which currently comprises partisan primaries for party candidates and nomination papers for nonparty candidates, with a single, all-party primary in which all candidates would be listed on one primary ballot and voters could vote for any candidate on the ballot regardless of party affiliation. The primary would be held in September, and the two candidates who receive the most votes in the primary irrespective of party affiliation would advance to the November general election, where voters could vote for either of the two top-finishing primary candidates or, alternatively, could set forth and vote for a write-in candidate of their choice.

The plaintiffs assert that the initiative petition contains subject matter excluded from the initiative process in violation of art. 48 of the Amendments to the Massachusetts Constitution; in particular, they contend that the initiative petition is inconsistent with the freedom of elections under art. 9 of the Massachusetts Declaration of Rights. A single justice of this court reserved decision and reported the case to the full court on the complaint and a statement of agreed facts from the parties.

We conclude that the challenged petition does not significantly interfere with the constitutionally protected right to vote or the interrelated right of individuals to seek

elected office.  Further concluding that the initiative petition bears a real and substantial relation to legitimate State interests, we affirm the Attorney General's certification of the initiative petition and remand the case to the county court for entry of a judgment declaring that the Attorney General's certification complies with the requirements of art. 48.

1.  The petition.  In August 2025, at least ten registered voters filed Initiative Petition 25-12, titled "Initiative Petition for a Law to Implement All-Party State Primaries," with the Attorney General.  The petition proposes to change the current system for State elections, pursuant to which candidates affiliated with a recognized political party can reach the general election ballot by prevailing in their party's primary and receiving that party's nomination, while candidates not affiliated with a recognized party may do so by gathering sufficient signatures from registered voters on nomination papers.[3]  See G. L. c. 53, §§ 41, 44.  The petition would replace

---

[3] The current statutory process requires that candidates submit nomination papers signed by a certain number of registered voters to appear on the ballot; recognized party candidates must submit the requisite signatures to receive access to the party's primary election ballot, while nonparty candidates who obtain the requisite signatures gain direct access to the general election ballot.  G. L. c. 53, §§ 6, 44. All registered voters may participate in a primary; voters registered in one political party may vote in that party's primary, while voters not enrolled in a political party must choose the political party in whose primary they wish to participate.  G. L. c. 53, §§ 37, 38.

this system with a single, all-party primary to be held in September in which all candidates, regardless of party affiliation, would appear on the same primary ballot and all voters, regardless of party registration, would cast their votes on that ballot.  The two candidates who secure the most votes in the primary election would proceed to the general election, while others could still campaign as write-in candidates; the general election ballot would then bear the names of the top two candidates from the primary and a space for voters to write in and vote for an alternative candidate.

The Attorney General certified the petition, concluding that it did not contain excluded matters and otherwise conformed with the constitutional requirements of art. 48.[4]  The petition's proponents submitted sufficient certified signatures to require the Secretary of the Commonwealth (Secretary) to transmit the petition to the House of Representatives, and the Secretary did. As the Legislature did not enact the petition on or before May 6, 2026, the petition is eligible to be placed on the Statewide November election ballot subject to the proponents' successful

---

[4] As part of the art. 48 initiative process, proponents must file their petition with the Attorney General, who then must certify, inter alia, that the measure contains "only subjects not excluded from the popular initiative."  Art. 48, The Initiative, II, § 3, as amended by art. 74 of the Amendments. Pertinently, the Attorney General must certify that the law proposed by the petition is not "inconsistent with . . . freedom of elections."  Art. 48, The Initiative, II, § 2, third par.

collection of sufficient additional signatures. See art. 48, The Initiative, V, § 1, as amended by art. 81 of the Amendments.

2. Procedural history. The plaintiffs filed a complaint challenging the Attorney General's certification of the petition. They sought relief in the nature of certiorari and mandamus to quash the Attorney General's certification of the petition and to enjoin the Secretary from placing the petition on the general election ballot. They argue that the petition contains "excluded matters" under art. 48, because it is "inconsistent with" the "freedom of elections" guaranteed by art. 9. A single justice of this court reserved and reported the case to the full court.

3. Discussion. Pursuant to art. 48, "the people reserve to themselves the popular initiative, which is the power of a specified number of voters to submit constitutional amendments and laws to the people for approval or rejection." Art. 48, I. Article 48 imposes limitations on initiative petitions. See art. 48, The Initiative, II, § 2. As relevant here, art. 48 provides that "[n]o proposition inconsistent with any one of the following rights of the individual, as at present declared in the declaration of rights, shall be the subject of an initiative or referendum petition: . . . freedom of elections." Art. 48, The Initiative, II, § 2, third par. See art. 9 of the Massachusetts Declaration of Rights ("All elections ought to be

free; and all the inhabitants of this commonwealth, having such qualifications as they shall establish by their frame of government, have an equal right to elect officers, and to be elected, for public employments").

a.  Standard of review.  We review the Attorney General's certification of an initiative petition de novo.  Anderson v. Attorney Gen., 479 Mass. 780, 785 (2018).  In reviewing a challenge to the Attorney General's certification decision, "we construe art. 48 in a manner mindful that art. 48 establishes a 'people's process' that gives the people of Massachusetts the opportunity to enact statutes regardless of legislative opposition and to move forward on measures which they deem necessary and desirable regardless of legislative opposition" (quotations, citations, and alteration omitted).  Id.

As such, we have repeatedly recognized "the firmly established principle that art. 48 is to be construed to support the people's prerogative to initiate and adopt laws" (citation omitted).  Abdow v. Attorney Gen., 468 Mass. 478, 487 (2014).  "In other words, unless it is reasonably clear that a proposal contains an excluded matter, neither the Attorney General nor this court on review should prevent the proposal from appearing on the ballot."  Associated Indus. of Mass. v. Attorney Gen., 418 Mass. 279, 287 (1994).

"At the same time, however, we are obligated to safeguard the integrity of the initiative petition process by requiring that those seeking to change the law strictly comply with art. 48." Anderson, 479 Mass. at 785-786. "The State Constitutional Convention of 1917-1918 sought a balance between competing impulses toward direct versus representative democracy. The proper form and use of petitions is an important aspect of the balance art. 48 represents, and our review must respect that balance." Id. at 786, quoting Hurst v. State Ballot Law Comm'n, 427 Mass. 825, 828, S.C., 428 Mass. 116 (1998).

When determining whether the proposed initiative should be certified, the Attorney General's factual examination is "limited to matters implicit in the language of the petition and to matters of which the Attorney General may properly take official notice," including "[f]actual matters which are indisputably true," "matters of common knowledge or observation within the community," and "additional items of which an agency official may take notice due to the agency's established familiarity with and expertise regarding a particular subject area" (quotations and citation omitted). Yankee Atomic Elec. Co. v. Secretary of the Commonwealth, 403 Mass. 203, 205 (1988). "Certification should not be denied because of a speculative possibility that some fact or facts may exist, outside the range of the facts that the Attorney General should consider, that

would cause the petition to relate to an excluded matter." Associated Indus. of Mass., 418 Mass. at 286-287. If warranted, a postenactment challenge may be launched on a "more substantial factual record." Id. at 287. Accordingly, the question before us is whether the limited facts before the Attorney General "compel [the] conclusion that th[e] petition" is inconsistent with the freedom of elections. Yankee Atomic Elec. Co., supra at 208.

b. Freedom of elections. Article 9 provides that "[a]ll elections ought to be free; and all the inhabitants of this commonwealth, having such qualifications as they shall establish by their frame of government, have an equal right to elect officers, and to be elected, for public employments." Art. 9 of the Massachusetts Declaration of Rights. "Over the ensuing [246] years since the adoption of our Declaration of Rights in 1780, art. 9 has served to protect the 'fundamental' and 'intertwine[d]' rights of candidates to gain access to the

ballot and of voters to cast their ballots as they see fit."[5,6] Goldstein v. Secretary of the Commonwealth, 484 Mass. 516, 524 (2020), quoting Libertarian Ass'n of Mass. v. Secretary of the Commonwealth, 462 Mass. 538, 560 (2012) (LAM).  See LAM, supra, quoting Bullock v. Carter, 405 U.S. 134, 143 (1972) ("the rights of voters and the rights of candidates do not lend themselves to neat separation").

---

[5] "The Constitution of the Commonwealth expressly protects the right to vote for qualified voters in both art. 9 of the Massachusetts Declaration of Rights and in art. 3 of the Amendments to the Massachusetts Constitution, as amended" (footnote omitted).  Chelsea Collaborative, Inc. v. Secretary of the Commonwealth, 480 Mass. 27, 32 (2018).  This fundamental right is also "implicitly protected under other provisions of the Declaration of Rights," including arts. 1, 4, 7, and 8.  Id. at 33.  See id., quoting Dane v. Registrars of Voters of Concord, 374 Mass. 152, 160 (1978) ("right to vote is protected as 'natural, essential, and unalienable right[]' under art. 1 of Declaration of Rights"), Swift v. Registrars of Voters of Quincy, 281 Mass. 271, 276 (1932) ("The right to vote is a precious personal prerogative to be sedulously guarded" under "[a]rts. 4, 7, 8, [and] 9 of the Declaration of Rights"), and Attorney Gen. v. Suffolk County Apportionment Comm'rs, 224 Mass. 598, 601 (1916) ("The right to vote is a fundamental personal and political right" protected under arts. 1 through 9 of Declaration of Rights).

[6] "The right to seek elected office . . . is [similarly] a fundamental constitutional right in Massachusetts."  Goldstein v. Secretary of the Commonwealth, 484 Mass. 516, 523 (2020).  See Libertarian Ass'n of Mass. v. Secretary of the Commonwealth, 462 Mass. 538, 560 (2012) (LAM) ("Candidates for political office enjoy both a . . . right to participate equally in the electoral process and [to] associate with one another to achieve policy goals" [citation omitted]).

c. "Sliding scale" analysis. When we evaluate the constitutionality of a proposed election law, "we apply a 'sliding scale approach, . . . through which [we] weigh the character and magnitude of the burden the State's rule imposes on the [rights of candidates to gain access to the ballot and of voters to cast their ballots as they see fit] against the interests the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary.'"[7] Goldstein, 484 Mass. at 524, quoting LAM, 462 Mass. at 560.

Where an election law "significantly interferes" with voters' rights to cast their ballots freely or with candidates' rights to gain access to the ballot, we apply strict scrutiny to the regulation, which requires that it be narrowly tailored to advance a compelling State interest. Goldstein, 484 Mass. at 524. Our decision in Cepulonis v. Secretary of the Commonwealth, 389 Mass. 930 (1983), is illustrative. There, we considered a challenge by prisoners to the statutory scheme governing absentee voting, which required in-person registration

---

[7] While the sliding scale approach originates from Federal constitutional jurisprudence, we have noted previously that "there may be circumstances where the Massachusetts Declaration of Rights and art. 3 require application of this analysis in a manner that guards more jealously against the exercise of the State's police power than the application of the framework under the Federal Constitution" (quotation, citation, and alteration omitted). Chelsea Collaborative, Inc., 480 Mass. at 35.

to vote by absentee ballot.  Id. at 931.  Because they were incarcerated, and because no provision existed that would permit the prisoners either to register in prison or to register in-person in the town of their domicile, the statutory scheme, in effect, denied them the right to vote.  Id. at 935, 937 (noting that absentee ballot system "ha[d] the effect of disenfranchising a group of prospective voters for long periods of time").  Accordingly, we applied strict scrutiny.  Id. at 935-936.  We rejected the Commonwealth's assertion that the statutory scheme was narrowly tailored to prevent voter fraud, noting the absence of evidence that the goal could not be achieved while permitting registration of prisoners.  Id.  We posited that the goal could be achieved, inter alia, by providing registration opportunities in prison, as contemplated for local high schools and colleges, or by transporting prisoners to their local municipalities for in-person registration.  Id. at 936 n.10.  See Goldstein, 484 Mass. at 525-526 (applying strict scrutiny to statutes requiring minimum number of "wet" signatures that, in context of emergency protocols instituted during COVID-19 pandemic, significantly interfered with prospective candidates' right to gain access to primary ballot).

At the other end of the sliding scale, election procedures that "merely regulate and affect the exercise of [fundamental

rights] to a lesser degree are subject to rational basis review to assure their reasonableness."[8] Chelsea Collaborative, Inc. v. Secretary of the Commonwealth, 480 Mass. 27, 34 (2018). See LAM, 462 Mass. at 567 (concluding that election law imposing only "modest" burdens is subject to rational basis review). Rational basis review requires that the proposed election law "bear[] a real and substantial relation to the public health, safety, morals, or some other phase of the general welfare" (citation omitted). Chelsea Collaborative, Inc., supra at 40. The Commonwealth's "important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions" (quotations and citation omitted). LAM, supra at 560.

Thus, in Chelsea Collaborative, Inc., 480 Mass. at 29, we considered a constitutional challenge to a voter registration statute that, with certain exceptions, required those planning to vote in an election to register at least twenty days prior to election day. We determined that the statute was subject to rational basis review, reasoning that the statute "does not disenfranchise any voter," "the Commonwealth takes sufficient steps to minimize the number of qualified voters who miss [the

---

[8] "'[R]ational basis' and 'strict scrutiny' are 'shorthand for referring to the opposite ends of a continuum of constitutional vulnerability determined at every point by the competing values involved.'" Grossman v. Secretary of the Commonwealth, 485 Mass. 541, 547 n.12 (2020), quoting Chelsea Collaborative, Inc., 480 Mass. at 36 n.22.

deadline]," "registration itself is sufficiently simple and accessible," and the twenty-day period was not so far in advance of election day as to significantly interfere with the voting right. Id. at 37-38, 40. Honoring the possibility that a voter registration blackout period could potentially be established that is "so far from election day that . . . it . . . would significantly interfere with the right to vote," id. at 39-40, we concluded that the twenty-day period reflected "a reasonable legislative determination that the deadline [was] set as near as possible to election day as consistent with the need to maintain an orderly election," id. at 42. See LAM, 462 Mass. at 567 (concluding that election laws requiring minor party candidates to gather minimum number of signatures in advance of election, regardless of when party's national convention was held, imposed "modest burden[]" and thus were subject to and passed rational basis review, because State had legitimate interest in ensuring that candidates enjoyed substantial measure of support before appearing on ballot).

d. Applicable standard of review. The plaintiffs contend that, because the petition "significantly interferes" with both voters' and candidates' rights under art. 9, we must apply strict scrutiny. In particular, the plaintiffs argue that permitting only two candidates to appear on the general election ballot "curtails voter choice by . . . reducing . . . the field

of candidates available" and "exclud[es] candidates with significant community support who currently have a path to the general election" by way of either party nomination or the submission of nomination papers. Citing the experience of other States that have adopted similar election laws and historical data from the Commonwealth's current election system showing that voter turnout for primary elections generally is lower than in the general election, the plaintiffs maintain that the proposed law's single, all-party primary shifts both voters' choice and candidates' access to "a preliminary stage in the electoral process when many voters have yet to participate."

The Attorney General has a different view. She argues that the petition imposes only a "modest" regulatory burden on voters' and candidates' rights and is therefore subject to only rational basis review. The petition, the Attorney General contends, "holds all candidates to the same rules" and is less burdensome than other ballot access restrictions that have warranted strict scrutiny at the Federal level. See, e.g., Anderson v. Celebrezze, 460 U.S. 780, 792-794 (1983) (holding filing deadline for independent candidates more than seven months before election unconstitutional where deadline "place[d] a particular burden on an identifiable segment" of voters and "discriminate[d] against [independent] candidates and -- of

particular importance -- against those voters whose political preferences [lay] outside the existing political parties").

We agree with the Attorney General that rational basis review applies to the election law proposed by the petition. Significantly, the proposed election law in no way "disenfranchise[s] any voter." Chelsea Collaborative, Inc., 480 Mass. at 38. Under the proposal, every qualified voter would be able to participate in both the all-party primary and the general election. The proposed system would allow all voters to vote for any candidate in the primary, regardless of the voter's party affiliation. In addition, any voter whose preferred candidate is not among the top two primary finishers would nonetheless retain the ability to write in and vote for that candidate on the general election ballot. Cf. Cepulonis, 389 Mass. at 937 (applying strict scrutiny in holding voter registration law unconstitutional as applied to prisoners where "rule result[ed] in a totally arbitrary loss of the right to vote for some prisoners, but not others").

Relying on historical voter behavior data and the experience of other States that have adopted election laws similar to the proposal here, the plaintiffs argue that the petition would "relegate the opportunity for significant electoral choice to a lower-turnout [primary] election in which the majority of voters historically do not participate." That

argument, however, misapprehends the scope of the Attorney General's review at the certification stage. As the Attorney General notes, extrapolation from candidate and voter behavior in prior election cycles is of limited value because such extrapolation relies on observations under a different election system than the one proposed. At this stage, the Attorney General cannot engage in the predictive analysis urged by the plaintiffs; instead, she must consider whether there is no set of circumstances under which the law proposed would be valid. See Yankee Atomic Elec. Co., 403 Mass. at 208. Here, as the Attorney General notes, it is possible that under the proposed law voters would engage more fulsomely in the proposed all-party primary, understanding the enhanced significance of that preliminary stage under the new structure.

Moreover, the petition would not affect candidates' ability to participate in the all-party primary. Under the current system, all candidates must submit nomination papers signed by a designated number of registered voters to appear on the ballot: party candidates must submit these signatures to appear on their party's primary ballot, while nonparty candidates who submit the requisite signatures are placed directly on the general election ballot. See G. L. c. 53, §§ 6, 44-46. The petition does not alter the requirement to show a minimum level of support; all candidates who achieve the existing signature thresholds --

regardless of party affiliation or lack thereof -- would be listed on the same single primary ballot.

To be sure, the proposed law shifts voters' most diverse candidate selection to an earlier point in the election cycle. However, because the all-party primary would take place in September of the election year, it allows candidates an equal opportunity to reach voters at the height of election attention before the general election in November.  See Washington State Republican Party v. Washington State Grange, 676 F.3d 784, 794 (9th Cir.), cert. denied, 568 U.S. 814 (2012) (reasoning that "[b]y giving minor-party candidates access to [an] August primary ballot" instead of earlier primary contest in March, all-party primary system allowed those candidates to capitalize on heightened voter attention).  Cf. Celebrezze, 460 U.S. at 786, 790-792 (holding early filing deadline that required independent candidates to file in March in order to appear on November ballot unconstitutional because it prevented independent candidates from taking advantage of "unanticipated political opportunities" that might arise later in election cycle and required independent candidates to gather petition signatures at time when voters were not attuned to upcoming campaign).  By allowing minor party and nonparty candidates to participate in the September primary "at the same time, and on the same terms, as major party candidates," the petition grants

them "an opportunity to appeal to voters at a time when election interest is near its peak, and to respond to events in the election cycle just as major party candidates do." Washington State Republican Party, supra.

In addition, nothing in the proposed law precludes candidates who do not finish in the top two in the primary from continuing to campaign for voters' support. And voters may continue to support their preferred alternative candidate by adding that candidate's name as a write-in candidate in the space provided on the general election ballot, as required by the proposed law. See Graham v. Roberts, 200 Mass. 152, 157 (1908) ("[The] space for writing in names not printed on the ballot . . . secures the right of every one to vote as he pleases, and the requirements limiting the names that are to be printed on the ballot are within the power of the Legislature"). See also Cole v. Tucker, 164 Mass. 486, 488 (1895) (noting courts' widespread approval of ballot acts that "permit the voter to vote for such persons as he please by leaving blank spaces on the official ballot in which he may write or insert in any other proper manner, the names of such persons, and by giving him the means and a reasonable opportunity to write in or insert such names" and collecting cases).

Further, the all-party primary system does not discriminate against any party or idea, nor does it unfairly advantage one

type of candidate.  The petition gives major party, minor party, and nonparty candidates the same opportunity to advance to the general election by requiring that all candidates demonstrate the same base level of support to gain access to the primary -- the number of signatures required for the elected office sought -- and imposing the same threshold on all candidates to advance to the general election.  See LAM, 462 Mass. at 562 (upholding election law where challenged ballot access provisions were "nondiscriminatory," "extend[ed] to all classes of candidates an equality of opportunity," "subject[ed] all political organizations . . . to the same criteria," and were not "unduly burdensome for candidates unaffiliated with the recognized political parties" [quotations and citations omitted]); Washington State Republican Party, 676 F.3d at 795 ("because [the ballot initiative] gives major- and minor-party candidates equal access to the primary and general election ballots, it does not give the established parties a decided advantage over any new parties struggling for existence" [quotation and citation omitted]); Opinion of the Justices, 368 Mass. 819, 823 (1975) (upholding proposed election statute where restrictions imposed on independent candidates by proposal were "no greater than those imposed on members of political parties").

We conclude that "[g]iven the[] modest burdens imposed" by the petition on voters' and candidates' rights, "there need be

only a rational basis undergirding the [petition] in order for it to pass constitutional muster" (citation omitted).  LAM, 462 Mass. at 567.

e.  Application of rational basis review.  To withstand rational basis review, the petition must "bear[] a real and substantial relation to the public health, safety, morals, or some other phase of the general welfare" (citation omitted).  Chelsea Collaborative, Inc., 480 Mass. at 40.  We have previously sustained proposals that would "reasonably regulate elections and access to a place on the ballot."  Goldstein, 484 Mass. at 524, quoting Opinion of the Justices, 368 Mass. at 821.  See, e.g., Grossman v. Secretary of the Commonwealth, 485 Mass. 541, 553 (2020) (applying rational basis review and concluding that "the Legislature acted rationally when it concluded that a September 1 deadline for the receipt of mail-in ballots in the primary election was necessary to achieve the legitimate public purposes of conducting orderly primary and general elections" during COVID-19 pandemic); LAM, 462 Mass. at 567 (applying rational basis review and upholding candidate filing deadline in light of State's legitimate interest in "ensuring that a candidate makes a preliminary showing of a substantial measure of support [before] appearing on the ballot" [citation omitted]).

Indeed, more than a century ago this court considered the constitutionality of an all-party primary system for municipal elections. See Graham, 200 Mass. at 155-156. In Graham, we determined that such a system was constitutionally sound under art. 9, holding that "[t]he regulation that only the names of the two candidates chosen at the preliminary election shall appear on the final official ballot is simply a regulation for the election, which the Legislature and the people may adopt." Id. at 156. The plaintiffs contend that because the Graham court referenced "the question [of] the voting of women" in municipal elections, id. at 157, that case was "decided in an entirely different era" and should therefore serve as "no more than a point of historical interest." While we recognize that "statutory requirements that were once considered constitutionally permissible may later be found to interfere significantly with a fundamental right as societal conditions and technology change," Goldstein, 484 Mass. at 525, we see nothing in the petition before us that suggests a different outcome from that which we arrived at in Graham should portend here.

In particular, the Attorney General has identified several State interests served by the all-party primary: it levels the playing field for major and minor party candidates by imposing the same requirements across all candidates; offers voters more

choice earlier in the election cycle by allowing them to choose from a broader candidate pool rather than only from among candidates of their chosen political party; narrows the field of candidates for the general election so voters can focus on fewer candidates; requires that candidates garner enough support to finish in the top two primary positions to ensure their advancement to the general election;[9] and ensures a more competitive general election between the top two candidates. These are legitimate public objectives, and the means selected to achieve them, the all-party primary, "bears a rational relationship to [these] goal[s]." Opinion of the Justices, 375 Mass. 795, 811 (1978).

We find persuasive similar determinations by the United States Supreme Court and the United States Court of Appeals for the Ninth Circuit regarding the constitutionality of similar laws, albeit in the context of constitutional challenges to those laws as violating the freedom of association guaranteed by the First Amendment to the United States Constitution.[10]  In

---

[9] While the plaintiffs protest that the write-in option is insufficient to secure a meaningful opportunity for candidates who fail to secure one of the top two spots after the primary to appear on the general election ballot, it is reasonable for the State to require a candidate to have some measure of support before listing the candidate's name on the printed general election ballot.  See LAM, 462 Mass. at 567.

[10] Unlike the United States Constitution, the Massachusetts Constitution and Declaration of Rights expressly grant to voters

California Democratic Party v. Jones, 530 U.S. 567, 570 (2000) (Jones), the Supreme Court addressed whether a State could change its partisan primary from a closed primary, in which each voter's primary ballot was limited to candidates of his or her own political party and only the party's members could vote on its nominee, to a blanket primary, in which each voter's primary ballot would list every candidate regardless of party affiliation and allow the voter to choose freely among them. The candidate of each party who won the most votes in the blanket primary would become that party's nominee for the general election. Id. The Court noted four State interests assertedly served by such a system -- promoting fairness, affording voters greater choice, increasing voter participation, and protecting privacy -- but concluded that the proposed system was not a narrowly tailored means of furthering them. Id. at 584, 585. Relevant to the present matter, however, the Court observed:

---

the right to elect officers and to candidates the right to run for office. As such, the question before us is not "whether the proposed law would abridge [analogous] freedoms as they exist under the Federal Constitution, but whether the proposed law would abridge them as they exist under the Massachusetts Declaration of Rights, for, if it would, [art.] 48 excludes the proposed law from the popular initiative." Associated Indus. of Mass., 418 Mass. at 284, quoting Bowe v. Secretary of the Commonwealth, 320 Mass. 230, 249-250 (1946). "Upon [this] question of Massachusetts law, Federal decisions are persuasive, but not controlling." Associated Indus. of Mass., supra, quoting Bowe, supra at 250.

> "Respondents could protect [all of these State interests] by resorting to a nonpartisan blanket primary. Generally speaking, under such a system, the State determines what qualifications it requires for a candidate to have a place on the primary ballot[,] . . . [and] [e]ach voter, regardless of party affiliation, may then vote for any candidate, and the top two vote getters . . . then move on to the general election. . . . Under a nonpartisan blanket primary, a State may ensure more choice, greater participation, increased 'privacy,' and a sense of 'fairness' -- all without severely burdening a political party's First Amendment right of association."

Id. at 585-586.

Applying this dictum from Jones, the Ninth Circuit in Washington State Republican Party, 676 F.3d at 787, determined that Washington's "top two" nonpartisan primary system, an election law similar in all material respects to the petition's proposal, did not violate the First Amendment associational rights of the State's political parties. Recognizing the possibility that a top two primary system "makes it more difficult for minor-party candidates to qualify for the general election ballot than regulations permitting a minor-party candidate to qualify for a general election ballot by filing a required number of petition signatures," the Ninth Circuit nonetheless concluded that "[t]his additional burden . . . is an inherent feature of any top two primary system, and the Supreme Court has expressly approved of top two primary systems." Id. at 795, citing Jones, 530 U.S. at 585-586. Although they are not controlling, we "give respectful consideration to persuasive

decisions of the Federal courts," Commonwealth v. Moore, 379
Mass. 106, 110 (1979), and find these cases persuasive insofar
as they recognize legitimate State interests furthered by an
all-party primary election of the kind proposed in the petition.

In sum, we conclude that the petition is a "measured and
reasonable attempt to regulate elections," LAM, 462 Mass. at 567
n.29, and does not significantly interfere with the
constitutionally protected right to vote or the interrelated
right of individuals to seek elected office.

4. Conclusion. Our task is not to determine whether the
proposal at issue is better or worse than the current system, or
whether it will serve government interests more or less
effectively than the status quo; our responsibility solely is to
determine whether the petition before us presents a reasonable
regulation of elections that rationally relates to the general
welfare.[11]  See Graham, 200 Mass. at 153 ("the question before us
is not whether the provisions of the [proposal] are well adapted

_____

[11] The plaintiffs make much of the Attorney General's
decision not to certify a related initiative petition, which was
identical to the petition at issue except that it did not
provide a write-in option.  The Attorney General did not certify
that petition, concluding that it was inconsistent with the
freedom of elections.  The plaintiffs argue that, based on the
Attorney General's reasoning for declining to certify that
proposal, this petition similarly fails.  That related petition
is not before us, however; our analysis concerns only whether
this petition is inconsistent with the freedom of elections, not
the petition's efficacy or merits relative to other failed
petitions or the status quo.

to conditions existing in the [State] and likely to give the people a beneficent and well ordered government, but whether they are within the constitutional power of the [people] to enact").  This limited question requires us to determine whether the petition "bear[s] a real and substantial relation to the public health, safety, morals, or some other phase of the general welfare" (citation omitted).  Chelsea Collaborative, Inc., 480 Mass. at 40.  We conclude that it does.  Accordingly, we remand the case to the county court for entry of a judgment declaring that the Attorney General's certification complies with the requirements of art. 48.

So ordered.